## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | ) ) ) | |
| Plaintiff, | ) ) | |
| and | ) ) | CIVIL ACTION NO. |
| SABULAL VIJAYAN,  JACOB JOSEPH KADAKKARAPPALLY, KURIAN DAVID, SONY VASUDEVAN SULEKHA, PALANYANDI THANGAMANI, MURUGANANTHAM KANDHASAMY, HEMANT KHUTTAN, PADAVEETTIYIL ISSAC ANDREWS, KECHURU DHANANJAYA, KRISHAN KUMAR, KULDEEP SINGH, AND THANASEKAR CHELLAPPAN | ) ) ) ) ) ) ) ) ) ) ) | 2:12-cv-00557 SECTION E JUDGE MORGAN MAGISTRATE 3 MAG. JUDGE KNOWLES COMPLAINT IN INTERVENTION |
| Plaintiffs-Intervenors, | ) ) | |
| v. | ) ) | |
| SIGNAL INTERNATIONAL, LLC, | ) ) | |
| Defendant. | ) ) | |

## PROPOSED FIRST AMENDED COMPLAINT IN INTERVENTION

### Preliminary Statement

1.  Defendant Signal International, LLC ("Signal"), a major Alabama, Mississippi, and Texas-based rig and ship fabrication and repair company, forced Plaintiffs-Intervenors Sabulal Vijayan, Jacob Joseph Kadakkarappally, Kurian David, Sony Vasudevan Sulekha, Palanyandi Thangamani, Muruganantham Kandhasamy, Hemant Khuttan, Padaveettiyil Issac Andrews, Kechuru Dhananjaya, Krishan Kumar, Kuldeep Singh, and Thanasekar Chellappan ("Plaintiffs-

1

Intervenors") and other Indian H-2B workers (collectively, including Plaintiffs-Intervenors, "the Indian Workers") to live in overcrowded, unsanitary, and guarded "man camps" for which these workers paid dearly.  For a 6 foot by 3 foot top or bottom bunk with barely enough headroom to sit up in a room shared with as many as 23 other men, which Signal itself acknowledged was not compliant with the requirements of the Occupational Safety and Health Act ("OSHA"), and food prepared by an outfit that Signal management said would be shut down if the Health Department ever inspected it, Signal required the Plaintiffs-Intervenors to pay astronomical rent -- $ 1,050 per month.  The Plaintiffs-Intervenors, however, also paid with their health, their freedom, and their livelihoods.

2.      Among Signal's many employees at its two production sites, only the Indian Workers were required to pay these exorbitant rent charges and only the Indian Workers lived in the man camps.  Signal specifically intended the man camps to be for Indian Workers only; segregated and isolated to such an extent that visitors – be they close relatives, friends, language teachers, clergy, or legal services providers – were not allowed to enter the compound.  Indeed, Defendant Signal would not have subjected, and did not subject, its non-Indian workforce to these conditions.

3.      Plaintiffs-Intervenors and the other Indian Workers arrived at Signal having paid as much as $20,000 to Signal's labor recruiters and attorney.  To work at Signal, Plaintiffs-Intervenors were required to apply through these specific recruiters and attorney, and therefore they had no choice but to pay these fees.  When some workers sought to come to Signal directly without going through these recruiters and this attorney, Signal refused to allow them to do so.  For the Indian Workers, fees of this size required selling possessions of value, mortgaging futures, and entering into desperate debt.  No non-Indian Signal employees were required to use a specific

2

recruiter, nor did any non-Indian Signal employees arrive at Signal having paid a similarly high amount of money to any recruiter.

4.      Signal also subjected the Plaintiffs-Intervenors and others to abusive treatment based on their race and/or national origin.  Signal referred to Indian Workers by their Signal employee numbers and not by their names.  Signal supervisors and management used derogatory language to demean the Plaintiffs-Intervenors and other Indian Workers, including referring to them as "thieves" and "animals"; telling them to "shut up" when they raised complaints to Signal; saying that the man camps were better than the Indian Workers' homes in India; and referring to Indian Workers as "F…ing Keralite," "rat[s]," "chronic whiners," and "back-stabbing whining little bitches."  This race and national origin based treatment created a hostile work environment for the Plaintiffs-Intervenors and the other Indian Workers.

5.      Signal assigned Plaintiffs-Intervenors to the most dangerous, difficult, and dirty jobs on the rigs they were repairing, at times without adequate safety procedures in place.  Plaintiffs-Intervenors believe they were assigned to these posts because of their race and national origin because few non-Indian Workers received such unwanted assignments.

6.      Plaintiffs-Intervenors Sabulal Vijayan and Jacob Joseph Kadakkarappally complained to Signal management about these unwanted and unhealthful living and working conditions and tried to meet with other workers to coordinate a response.  After engaging in these activities, on March 9, 2007, Signal rounded them up in a public display designed to intimidate the other Indian workers, imprisoned Kadakkarappally in a guarded room to await forced deportation, and attempted to so detain Vijayan.  Only the attention of the media and the arrival of the local police, along with a gathering of concerned supporters outside Signal's gates and a suicide attempt by Vijayan, who decided he would rather die than be forced to return to his crippling

debt in India, thwarted the deportation.  In all, the March 9 incident – which Signal itself has referred to as "Black Friday" – was a flagrant effort to retaliate against Vijayan and Kadakkarappally for complaining about Signal's illegal, inhumane, and discriminatory treatment.

7.      Plaintiffs-Intervenors therefore join the Equal Employment Opportunity Commission ("EEOC") in this suit to vindicate their rights under Title VII of the Civil Rights Act of 1964.

### Jurisdiction and Venue

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as a case arising under the laws of the United States; under 28 U.S.C. § 1343(d), as a case seeking relief under an Act of Congress providing for the protection of civil rights; and under 42 U.S.C. § 2000e-5(f)(3), as a case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

9.      Venue lies in this district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3). This action also may be appropriately venued in other districts.

### The Parties

**Plaintiff**

10.      The Equal Employment Opportunity Commission ("EEOC") is a federal agency charged with enforcing Title VII.

**Plaintiffs-Intervenors**

11.      Plaintiff-Intervenor Sabulal Vijayan was recruited beginning in late 2003 from the United Arab Emirates and India for work in the United States. Vijayan worked for Defendant Signal in Pascagoula, Mississippi from late 2006 until Signal terminated his employment on March 9, 2007.

12.      Vijayan filed a Charge of Discrimination with the EEOC on or around April 12, 2007.

4

13.     On or around September 14, 2009, the EEOC Area Director issued a Determination to Vijayan finding reasonable cause to believe that the Defendant Signal (who was the Respondent to Vijayan's Charges of Discrimination) violated Title VII of the Civil Rights Act of 1964.

14.     Plaintiff-Intervenor Jacob Joseph Kadakkarappally was recruited beginning in late 2003 from the United Arab Emirates and India for work in the United States. Kadakkarappally worked for Defendant Signal in Pascagoula, Mississippi from late 2006 until Signal terminated his employment on March 9, 2007.

15.     Kadakkarappally filed a Charge of Discrimination with the EEOC on or around April 12, 2007.

16.     On or around September 14, 2009, the EEOC Area Director issued a Determination to Kadakkarappally finding reasonable cause to believe that the Defendant Signal (who was the Respondent to Kadakkarappally's Charges of Discrimination) violated Title VII of the Civil Rights Act of 1964.

17.     Plaintiff-Intervenor Kurian David was recruited in 2006 from the United Arab Emirates and India for work in the United States.  After arriving in the United States in 2007, David worked at Signal's Orange, Texas facility.

18.     Plaintiff-Intervenor Sony Vasudevan Sulekha was recruited in 2006 from India for work in the United States.  After arriving in the United States in 2006, Sulekha worked at Signal's Pascagoula, Mississippi facility.

19.     Plaintiff-Intervenor Palanyandi Thangamani was recruited in 2006 from India for work in the United States.  After arriving in the United States in 2006, Thangamani worked at Signal's Pascagoula, Mississippi facility.

20.     Plaintiff-Intervenor Muruganantham Kandhasamy was recruited in 2006 from India for work in the United States.  After arriving in the United States in 2007, Kandhasamy worked at Signal's Orange, Texas facility.

21.     Plaintiff-Intervenor Hemant Khuttan was recruited in 2006 from India for work in the United States.  After arriving in the United States in 2007, Khuttan worked at Signal's Pascagoula, Mississippi facility.

22.     Plaintiff-Intervenor Padaveettiyil Issac Andrews was recruited in 2004 from the United Arab Emirates and India for work in the United States.  After arriving in the United States in 2006, Andrews worked at Signal's Pascagoula, Mississippi facility.

23.     Plaintiff-Intervenor Kechuru Dhananjaya was recruited in 2003 from the United Arab Emirates and India for work in the United States.  After arriving in the United States in 2007, Dhananjaya worked at Signal's Orange, Texas facility.

24.     Plaintiff-Intervenor Krishan Kumar was recruited beginning in 2006 from India for work in the United States.  Kumar worked for Defendant Signal in Pascagoula, Mississippi from early 2007 until Signal terminated his employment on March 9, 2007.

25.     Plaintiff-Intervenor Kuldeep Singh was recruited beginning in 2006 from India for work in the United States.  Singh worked for Defendant Signal in Pascagoula, Mississippi from early 2007 until Signal terminated his employment on March 9, 2007.

26.     Plaintiff-Intervenor Thanasekar Chellappan was recruited beginning in 2006 from India for work in the United States.  Chellappan worked for Defendant Signal in Pascagoula, Mississippi from early 2007 until Signal terminated his employment on March 9, 2007.

27.     At all times relevant to this action, David, Sulekha, Thangamani, Kandhasamy, Khuttan, Andrews, Dhananjaya, Kumar, Singh, and Chellappan were similarly situated to Plaintiffs-Intervenors Vijayan and Kadakkarappally and to the other Indian Workers.

28.     Plaintiffs-Intervenors and the other Indian Workers are of Asian race and are Indian nationals.

**Defendant**

29.     At all relevant times, Defendant Signal, a Delaware corporation, has been doing business in Pascagoula, Mississippi, and in Orange, Texas.  Signal is engaged in the business of building and repairing ships and off-shore oil rigs.

30.     At all relevant times herein, Defendant Signal has continuously been an employer engaged in an industry affecting commerce within the meaning of § 701(b), (g) and (h) of Title VII, 42 U.S.C. § 2000e-(b), (g) and (h).

## THE NATURE OF THE COMPLAINT

31.     Defendant Signal, in the aftermath of Hurricane Katrina, was unable to obtain a sufficient number of qualified and reliable pipe fitters and welders to meet the demands of its work load.

32.     Defendant Signal, to meet this need, arranged to bring into the United States approximately 500 Indian men (the Indian Workers) through the federal government's H-2B guestworker program.

33.     Defendant Signal entered into contracts with United States-based recruiter Michael Pol d/b/a Global Resources, Inc. (collectively "Pol"); United States-based attorney Malvern C. Burnett d/b/a Gulf Coast Immigration Law Center, LLC and Law Offices of Malvern C. Burnett, A.P.C. (collectively "Burnett"); and India-based recruiter Sachin Dewan d/b/a Dewan

Consultants Pvt. Ltd a/k/a Medtech Consultants (collectively "Dewan") (Pol, Burnett, and Dewan collectively referred to as "the Recruiters").

34.     When Defendant Signal entered into a contract with the Recruiters in April 2006, the representatives of Signal who executed the contract knew that Signal would not pay any recruitment fee, service charge, transportation expense, visa issuance fee, legal fee, or any other fee, expense, charge or money whatsoever to the Recruiters for any part of the recruitment, processing, arrangement, or transportation of the Indian Workers.

35.     At that time, the representatives of Signal who executed the contract knew that the Indian Workers themselves would pay these fees, expenses, and charges to the Recruiters.

36.     The Indian Workers in fact each paid up to $20,000 U.S. Dollars to the Recruiters. Specifically, Plaintiff-Intervenor Vijayan paid approximately $12,670, Kadakkarappally paid approximately $13,226, David paid approximately $13,000, Sulekha paid approximately $13,150, Thangamani paid approximately $13,000, Kandhasamy paid approximately $13,000, Khuttan paid approximately $18,785, Andrews paid approximately $11,380, Dhananjaya paid approximately $14,000, Kumar paid approximately $24,950, Singh paid approximately $22,000, and Chellappan paid approximately $22,000 for the opportunity to work at Signal.

37.     At all relevant times, Signal would not accept Indian workers who did not use the Recruiters' services.

38.     At all relevant times, the Recruiters acted as Signal's agents and all actions the Recruiters took during the recruitment process were with Signal's express or implied authority.

39.     No welders or fitters directly employed by Signal, other than the Indian Workers, paid recruitment fees in amounts comparable to the amounts the Indian Workers paid.

40.     Upon information and belief, no welders or fitters directly employed by Signal, other than the Indian Workers, paid recruitment fees that exceeded a few hundred dollars.

41.     Upon information and belief, no welders or fitters directly employed by Signal, other than the Indian Workers, began their employment in debt as a product of recruitment fees.

42.     No welders or fitters directly employed by Signal, other than the Indian Workers, were required to use the Recruiters, nor any particular recruiter, in order to obtain employment at Signal.

43.     The Indian Workers were hired by Signal to provide labor and services at its Pascagoula, Mississippi, and Orange, Texas, locations.

44.     The first Indian Workers arrived in the end of October 2006.  Additional workers came to the United States in groups of 30 to 50 workers at a time until approximately March 2007.

45.     Signal brought over a total of just under 500 Indian Workers to the United States, sending approximately 288 workers to its facility in Pascagoula, Mississippi, and approximately 200 workers to its facility in Orange, Texas.

46.     At each location, the Indian Workers were required to live in modular trailers called "man camps."  Signal built the "man camps" for the exclusive use of the Indian Workers.  No other Signal employees were required to live in the "man camps."

47.     Before the Indian Workers were permitted to begin work, Signal required them to sign employment and housing agreements. These agreements were written in English, few of the Indian Workers read or understood English well, and Signal did not give the Indian Workers adequate time to read or understand these documents.

48.     One of these agreements allowed Signal to deduct $35 a day (or approximately $1050 per month) from each Indian Worker's earnings to reimburse Signal for the cost of providing food,

accommodations, and transportation for each such Indian Worker.  Under this agreement Signal could continue to deduct this amount from the worker's salary even if the Indian Worker elected not to eat the meals provided by Signal and not to live in the accommodations provided by Signal.  These deductions also applied to days when for which the Indian Workers were not paid, such as holidays, sick days, weekends, and days with inclement weather where workers were unable to work.

49.     The "man camps" were located on Signal property in isolated, industrial areas miles removed from shopping areas, places of worship, and residential communities.  The camps were enclosed by fences and accessible only through a single guarded entrance.

50.     Signal assigned numbers to each Indian Worker and used these numbers as a form of identification and reference rather than using the employee's name.

51.     Signal camp personnel and supervisors used offensive language in speaking with and/or referring to the Indian Workers and insulted the Indian Workers on the basis of their race and/or national origin.

52.     Signal guards monitored the comings and goings of the Indian Workers by requiring them to show their employee identification badges.  Signal guards also searched the packages and bags of Indian Workers when they entered the camps.

53.     Except on rare occasions, the Indian Workers were not permitted to receive visitors in the "man camps."

54.     The "man camps" were composed of a series of one room trailers connected by elevated walkways.  Most of the trailers were for sleeping and were referred to as "bunkhouses."  Up to twenty-four men were housed in each bunkhouse, sleeping in two-tiered bunk beds.  The bunk beds were so tightly packed in the bunkhouses that it was difficult for the Indian Workers to

move about in the narrow passageways between bunks.  Signal recognized that the bunkhouses were not compliant with the requirements of OSHA and decided against making them OSHA compliant by having fewer Indian Workers in each bunkhouse because doing so would be too "onerous" for Signal.

55.     The bunkhouses had insufficient toileting and bathing facilities for the twenty-four men. The Indian Workers were forced to rise early to take their place in line for the few toilets and showers in each trailer.

56.     Privacy was non-existent for the Indian Workers. The Indian Workers experienced extreme difficulty sleeping due to the constant noise resulting from the close quarters and the comings and goings of workers who worked on different shifts but were housed closely together in the same bunkhouses.  Signal also had control over when the lights were turned on and when the lights were turned off in the bunkhouses as even that decision was not left up to the Indian Workers.

57.     Signal personnel conducted surprise searches of the bunkhouses, including searches of the Indian Workers' personal belongings.

58.     The Indian Workers took their meals in mess halls which were part of the "man camps." The mess halls were only open during limited hours, set by Signal.  The food provided by Signal was of poor quality and was frequently bad, stale or molded.

59.     As a result of unsanitary conditions, sickness was rampant in the camps, and the Indian Workers sometimes required hospitalization.

60.     The "man camps" had rules, enforced by Signal guards. The penalty for breaking rules was $250 for the first violation and $500 for a second violation.

61.     When the Indian Workers complained and asked to live outside the labor camps, Signal told the workers that even if they lived outside the camps, Signal would continue to deduct the $35/day charge from the Indian Workers' weekly wages.  As a result, the Indian Workers reasonably felt that they had no choice but to continue to live in the Signal "man camps."  No non-Indian Signal employees who lived outside the camps had such deductions taken from their wages.

62.     During the first two weeks of employing each Indian Worker, Signal also deducted between $100 and $200 a week from each employee's paycheck for tool kits which the Indian Workers were required to purchase from Signal.  On information and belief, Signal did not require non-Indian workers to buy tools from Signal.

63.     Vijayan and Kadakkarappally routinely complained to Signal, on behalf of themselves and the other Indian Workers, about the food, living conditions, camp facilities, camp rules, and terms and conditions of employment at Signal. Vijayan and Kadakkarappally frequently met with fellow Indian Workers to learn of their concerns relating to the conditions under which they were forced to work by Signal.

64.     In response to these complaints, Signal personnel warned the Indian Workers to stop complaining. Signal personnel and management regularly threatened the Indian Workers that if they did not continue working for Signal or did not work to Signal's specifications, they would be deported to India.

65.     After Signal ignored the Indian Workers' complaints regarding housing, food, and terms and conditions of employment, the Indian Workers living in the Pascagoula "man camp" continued meeting to discuss how to persuade Signal to improve the working conditions of the Indian Workers.

66.     On or about March 4, 2007, Vijayan, Kadakkarappally, and other Indian workers met with attorneys in a church near the Pascagoula facility. The purpose of this meeting was to discuss their rights as employees of Signal.

67.     Signal learned of the aforementioned meeting held on or about March 4, 2007. The recruiting agent Signal used in India, Sachin Dewan, called Vijayan's wife at her home in India and warned her that Vijayan must stop making complaints about Signal or Signal would return the Indian Workers to India.  Vijayan's wife informed Vijayan of this call.

68.     Vijayan informed the other Indian Workers about the call which his wife had received and word spread quickly through the Pascagoula and Orange camps regarding the threats against Vijayan.

69.     Vijayan and Kadakkarappally took leading roles in gathering information and voicing the complaints of the other Indian Workers to Signal.

70.     Signal called a meeting of the Indian Workers on or about March 8, 2007.  At this meeting, Signal management told the Indian Workers that Signal would fight back against any organizing efforts by the workers and that if Indian Workers brought any legal action against Signal, Signal would not extend any of the Indian Workers' H-2B visas, despite Signal's previous promises of extensions.

71.     The next morning, March 9, 2007, Signal locked the gate to the Pascagoula "man camp", thereby obstructing the sole means of direct entry to and exit from the camp.  Signal camp coordinator Darrell Snyder and approximately five security guards then swept through the bunkhouses carrying pictures of Vijayan, Kadakkarappally and other Indian Workers.

72.     Shortly after 5:00 a.m. on March 9, 2007, Signal forcibly transported Vijayan, Kadakkarappally and three other Indian Workers from their bunkhouse to another trailer used as

a TV room.  Signal's plan was to keep these employees in the room, to discharge them from employment, and then to transport them to the airport for immediate return to India.  Signal's plan was altered with regard to Vijayan because he attempted suicide by cutting his wrist. The other workers were placed in the TV room and kept there by guards who had instructions from Signal not to let the workers leave the room.

73.     On March 9, 2007, Signal discharged Vijayan and Kadakkarappally because of their complaints, organizing efforts, and discussions of discriminatory terms and conditions of employment.

74.     Starting with the mandatory use of the Recruiters and continuing until the employment of all Indian Workers ceased,  Signal subjected such employees to terms and conditions of employment that were less favorable than those enjoyed by their non-Indian counterparts.

75.     This unequal treatment included, but was not limited to, Indian Workers being assigned the most undesirable work at the facilities which non-Indian Workers were not asked to perform, harassment and insults based on the workers' race and national origin, mandatory subjection to inferior living conditions in the man camps where no non-Indian workers were required to live, mandatory rent and meal deductions, mandatory use of the Recruiters who required payment of high recruitment fees, and other disparate terms and conditions of employment.

## COUNT I

### [Title VII Hostile Work Environment Based on National Origin/Race]

### [Claim by All Plaintiffs-Intervenors]

76.     Plaintiffs-Intervenors incorporate and reassert the aforementioned paragraphs 10 through 75 of this Complaint in Intervention.

77.     Since at least October 2006, Signal has engaged in unlawful employment practices at their Pascagoula and Orange locations in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), including subjecting the Plaintiffs-Intervenors and other Indian Workers to a hostile work environment based on race and/or national origin.

78.     Signal created and perpetuated a hostile work environment against the Plaintiffs-Intervenors and other Indian Workers based on their race and/or national origin. Signal's supervisors and managers made offensive and unwanted derogatory comments about the Plaintiffs-Intervenors and other Indian Workers and engaged in a series of demeaning and discriminatory actions, specifically directed solely at the Plaintiffs-Intervenors and other Indian Workers based on their race and/or national origin.

79.     Signal's conduct was offensive, severe, unwelcome and pervasive and interfered with the Indian Workers' working conditions. Signal subjected the Plaintiffs-Intervenors and other Indian Workers to a hostile work environment, which included but was not limited to:

    a.  Calling the Indian Workers insulting and offensive comments based on their race and/or national origin;

    b.  Calling the Indian Workers "thieves" and "animals";

    c.  Telling Indian Workers to "shut up" when Indian Workers raised complaints to Signal;

    d.  Telling Indian Workers that the conditions in the man camps were better than the workers' homes in India; and

    e.  Referring to the Indian Workers as "F…ing Keralite", "rat[s]", "chronic whiners", and "back-stabbing whining little bitches".

80.     The hostile environment that existed at Signal facilities was created and perpetuated at the direction of Signal's management and supervisory personnel with direct supervisory and/or managerial authority over the Plaintiffs-Intervenors and other Indian Workers.

81.     The unlawful hostile environment occurred with the full knowledge of Signal's management and supervisory personnel, and Signal failed to exercise reasonable care either to prevent the creation of this hostile environment or to correct promptly the hostile environment once it existed.

82.     The unlawful employment practices complained of in the aforementioned paragraphs 10 through 81 were intentional, and done with malice or with reckless indifference to the federally protected rights of the Plaintiffs-Intervenors.

83.     The effect of the intentional practices complained of in aforementioned paragraphs 10 through 82 has been to deprive the Plaintiffs-Intervenors of equal employment opportunities and otherwise adversely affect their status as employees because of their race and/or national origin. This unlawful conduct also resulted in emotional pain and suffering, embarrassment, and humiliation to the Plaintiffs-Intervenors.


### COUNT II

**[Title VII National Origin/Race Discrimination:
Employment Terms & Conditions]**

**[Claim by All Plaintiffs-Intervenors]**

84.     Plaintiffs-Intervenors incorporate and reassert the aforementioned paragraphs 10 through 83 of this Complaint.

85.     Starting with the mandatory use of the Recruiters by the Plaintiffs-Intervenors and all other Indian Workers, and continuing until the employment of the Plaintiffs-Intervenors and all

16

other Indian Workers ceased, Signal subjected such employees to terms and conditions of

employment that were less favorable than enjoyed by their non-Indian counterparts. These

employment practices violated § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a).

86.     This unequal treatment included but was not limited to

    a.   Effectively requiring the Indian Workers, but no non-Indian employees, to live in

         segregated, overcrowded, guarded, and unsafe man camps by charging mandatory

         room and board fees of 35 dollars per day (or otherwise charging these fees only

         to the Indian Workers and not Signal's non-Indian employees who lived off-site);

    b.   assigning the Indian Workers the most undesirable work at the facilities, which

         non-Indian Workers were not asked to perform;

    c.   requiring the Indian workers to obtain employment at Signal through two labor

         recruiters and an attorney who charged exorbitant fees up to $20,000, but not

         requiring non-Indian workers to use any particular recruiter or to pay such

         recruitment fees; and

    d.   other disparate terms and conditions of employment.

87.     The unlawful employment practices complained of in the aforementioned paragraphs 10

through 86 were intentional, and done with malice or with reckless indifference to the federally

protected rights of the Plaintiffs-Intervenors.

88.     The effect of the intentional practices complained of in aforementioned paragraphs 10

through 87 has been to deprive the Plaintiffs-Intervenors of equal employment opportunities and

otherwise adversely affect their status as employees because of their race and/or national origin.

This unlawful conduct also resulted in emotional pain and suffering, embarrassment, and

humiliation to the Plaintiffs-Intervenors.

## COUNT III

### [Title VII Retaliation]

### [Individual Claim for Plaintiffs-Intervenors Vijayan and Kadakkarappally]

89.     Plaintiffs-Intervenors incorporate and reassert the aforementioned paragraphs 10 through 88 of this Complaint in Intervention.

90.     Defendant Signal engaged in unlawful employment practices at its Pascagoula, Mississippi, facility in violation of § 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

91.     Vijayan and Kadakkarappally, on behalf of themselves and the other Indian Workers, opposed Signal's discriminatory treatment of the Indian Workers. Signal was aware of this opposition on the part of Vijayan and Kadakkarappally. As set forth in detail in the preceding paragraphs of this Complaint in Intervention, Signal retaliated against Vijayan and Kadakkarappally by increasing the severity of the discriminatory terms and conditions of their employment, and, on March 9, 2007, forcibly detaining them against their will and discharging them from employment because they opposed Signal's discriminatory treatment of the Indian Workers.

92.     The unlawful employment practices complained of in the aforementioned paragraphs 10 through 91 were intentional, and done with malice or with reckless indifference to the federally protected rights of Vijayan and Kadakkarappally.

93.     The effect of the intentional practices complained of in aforementioned paragraphs 10 through 92 has been to deprive Vijayan, and Kadakkarappally, individually, of equal employment opportunities and otherwise adversely affect their status as employees because they

opposed practices made unlawful by Title VII.  This unlawful conduct resulted in emotional pain and suffering, embarrassment, and humiliation to Vijayan and Kadakkarappally.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Grant the injunctive and prospective relief set forth in the First Amended Complaint of the Equal Employment Opportunity Commission, (Rec. Doc. 153, Prayer for Relief at ¶¶ A – C);

B.      Order Signal to make the Plaintiffs-Intervenors whole by compensating them for past and future pecuniary losses resulting from the unlawful employment practices described in paragraphs 1 through 93 above, including recruitment fees, relocation expenses, medical expenses, and room and board charges;

C.      Order Signal to make Plaintiffs-Intervenors whole by compensating them for non-pecuniary losses resulting from the unlawful employment practices described in paragraphs 1 through 93 above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation in amounts to be determined at trial;

D.      Order Signal to make Plaintiffs-Intervenors Vijayan and Kadakkarappally whole by compensating them for non-pecuniary losses resulting from the retaliation set forth in Count III, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation in amounts to be determined at trial;

E.      Order Signal to pay the Plaintiffs-Intervenors punitive damages for its malicious and reckless conduct described herein;

F.      Award Plaintiffs-Intervenors the costs in this action and reasonable attorneys' fees; and

G.      Grant such further relief as the Court deems necessary and proper in the public interest.

        Respectfully submitted this 15th day of October, 2012,

19

*/s/ Meredith Stewart*
Meredith Stewart
Louisiana Bar No. 34109
Eden Heilman
Louisiana Bar No. 30551
eden.heilman@splcenter.org
Sheila A. Bedi
Mississippi Bar No. 101652
Sheila.bedi@splcenter.org
Shakti Belway
Mississippi Bar No. 102095
Shakti.belway@splcenter.org
Southern Poverty Law Center
4431 Canal Street
New Orleans, Louisiana 70119
Telephone: (504) 486-8982
Facsimile: (504) 486-8947

*/s/ Thomas P. Fritzsche*
Thomas P. Fritzsche (*pro hac vice*)
Georgia Bar No. 940482
Tom.Fritzsche@splcenter.org
Daniel Werner (*pro hac vice*)
(Lead Counsel)
Georgia Bar No. 3969839
Daniel.werner@splcenter.org
Naomi Tsu (*pro hac vice*)
Georgia Bar No. 507612
Naomi.tsu@splcenter.org
Southern Poverty Law Center
233 Peachtree Street NE, Suite 2150
Atlanta, Georgia 30303
Telephone: (404) 521-6700
Facsimile: (404) 221-5857

Alan B. Howard (*pro hac vice*)
New York Bar No. 2136661
ahoward@crowell.com
Hugh Sandler (*pro hac vice*)
New York Bar No. 4712584
hsandler@crowell.com
Crowell & Moring LLP
590 Madison Avenue
New York, NY 10022
Telephone: (212) 803-4021

Joseph Bjarnson (*pro hac vice*)
New York Bar No. 4774055
jbjarnson@swcblaw.com
Sahn Ward Coschignano and Baker, PLLC
333 Earle Ovington Boulevard, Suite 601
Uniondale, New York 11553
Telephone: (516) 228-1300
Facsimile: (516) 228-0038

Chandra S. Bhatnagar (*pro hac vice*)
New York Bar No. 4136966
cbhatnagar@aclu.org
Human Rights Program
American Civil Liberties Union
125 Broad Street – 18th Floor
New York, New York 10004
Telephone: (212) 519-7840

Ivy Suriyopas (*pro hac vice*)
New York Bar No. 4406385
isuriyopas@aaldef.org
Asian American Legal Defense
    and Education Fund
99 Hudson Street, 12th Floor
New York, New York 10013
Telephone: (212) 966-5932

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of October, 2012, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record for all parties in this case.

Respectfully submitted,

**_/s/ Thomas P. Fritzsche_**
Thomas P. Fritzsche
Attorney for Plaintiffs-Intervenors